**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

DIABLO MEDIA, LLC, a Colorado limited
liability company,

           Plaintiff,

    v.

H2H INTERACTIVE, Inc., a Colorado
corporation,
RICHARD MIRSKY, an individual, and
NIKKI ZIMMER, an individual,

           Defendants.

---

## COMPLAINT

---

Plaintiff Diablo Media, LLC ("Diablo"), by and through its undersigned counsel, brings

this complaint against Defendants Richard Mirsky ("Mirsky"), h2h Interactive, Inc. ("H2H"),

and Nikki Zimmer ("Zimmer") (collectively, "Defendants"), and states and alleges as follows:

### INTRODUCTION

1.     Diablo is an Internet marketing company that specializes in what is commonly

referred to within the industry as "affiliate advertising."

2.     In the online advertising context, an affiliate is a person or business that publishes

online advertisements on their websites or blogs in exchange for commissions for referring sales,

leads, and/or traffic to an advertiser's website.

3.      Given the breadth of the Internet, and the dramatic rise of Internet marketing, it is not always economical or even feasible for an advertiser to procure and manage business relationships with multiple affiliates.  This problem is addressed by the services of entities known as "affiliate networks," which enlist, manage, and pay a large roster of affiliates to run Internet marketing campaigns for their clients, the advertisers.

4.      Diablo is a prominent affiliate network.  Diablo has excelled in its business, in part, by developing a proprietary list of affiliates (the "Affiliates"), with whom Diablo contracts to publish online advertisements for its client's websites.

5.      Through proprietary methods, Diablo tracks the performance of each Affiliate on the campaigns run by the Affiliate.

6.      In addition to its Affiliates, Diablo's business depends entirely on its relationship with its clients, or advertisers (the "Advertisers"), and Diablo has invested significantly into developing a proprietary list of Advertisers.

7.      For each Advertiser that Diablo works with, Diablo has negotiated a marketing commission, usually based on a cost-per-action, or "CPA" compensation model.  Under this model, the Advertiser pays Diablo each time a consumer visits the Advertiser's website and purchases a product from the Advertiser after being directed to the Advertiser's website by an advertisement on the webpage of an Affiliate.  In turn, Diablo pays a portion of the CPA commission to the Affiliate responsible for the sale.

8.      Through proprietary methods, Diablo also tracks the performance of each Advertiser's campaigns.

9.      Diablo has kept the identity of its Advertisers, the CPA agreed upon with each, and all campaign performance data strictly confidential.  The discovery of this information by

Diablo's competitors would seriously harm Diablo by allowing its competitors to contract with Diablo's Advertisers with a slightly lower CPA.  At that point, in such a highly-competitive industry, the Advertisers would have less incentive to work with Diablo, and might abandon Diablo for the lower-priced competitor.  Although the offers of the Advertisers are disclosed to Affiliates, the identity—and, most importantly, the advertising contact information—of the Advertiser that owns and operates each offer is kept confidential.

10.     Similarly, Diablo has kept the identity of its Affiliates, the CPA paid to each, and all performance data related to the Affiliate strictly confidential.  The discovery of this information by Diablo's competitors would seriously harm Diablo by allowing its competitors to contract with Diablo's Affiliates with a slightly higher compensation or other perks, such as tickets to professional sports events or cash-back "rewards."  At that point, the Affiliates would have less incentive to work with Diablo, and might abandon Diablo for the higher-paying competitor.

11.     Mirsky is a former executive of Diablo.

12.     During his tenure at Diablo, Mirsky, as Vice President of Business Development, had access to confidential information concerning the identity of Diablo's Advertisers and Affiliates, the performance of each, and the compensation models used for each.

13.     Zimmer is a former employee of Diablo.

14.     During her tenure at Diablo, Zimmer, as Affiliate Manager, had access to confidential information concerning the identity of Diablo's Advertisers and Affiliates, the performance of each, and the compensation models used for each.

15.     On information and belief, at some point during their employment with Diablo, Mirsky and Zimmer plotted to leave Diablo and form a competing affiliate network.

16.     Despite the express terms of their agreements with Diablo, which, among other things, bar disclosure of confidential information or solicitation of Diablo's Advertisers or Affiliates for a competitive business, Mirsky and Zimmer have breached these terms and misappropriated Diablo's proprietary Advertiser and Affiliate information.

17.     Upon parting ways with Diablo, Mirsky formed H2H, a competing affiliate network, and hired Zimmer to work for H2H.

18.     After the formation of H2H, Mirsky and Zimmer proceeded to use, and have continued to use, Diablo's confidential information to negotiate contracts and compensation models with Diablo's Advertisers on behalf of H2H.  Acting together, Defendants have engaged in this conduct in violation of federal law, Colorado law, and Mirsky's and Zimmer's respective agreements with Diablo. Defendants have also indicated to Diablo's Advertisers that Diablo's business model is unsustainable and that Diablo risks going out of business.

19.     Indeed, Defendants' misconduct has not stopped with Diablo.  Illustrating their blatant disregard for trade secrets and general lack of good faith, Defendants have also violated the rights of the Advertisers they poached from Diablo.

20.     For example, Mirsky and H2H were recently sued by a Diablo Advertiser that claims Defendants approached the Advertiser based on Mirsky's prior relationship with the Advertiser formed through his executive position at Diablo.  According to the Advertiser, Defendants offered to run the same advertising campaign as Diablo, and the Advertiser agreed. However, the Advertiser now believes that Defendants entered into the agreement to gain access to the Advertiser's proprietary business methods and clients, and that Defendants thereafter launched competing campaigns and solicited the Advertiser's clients. Accordingly, Defendants used Diablo's trade secrets to harm both Diablo and the Advertiser.

21. Defendants' mistreatment of this Advertiser is just one of many instances that Diablo has learned of where Defendants have misused and exploited Diablo's trade secrets in an effort to deprive Diablo of business and damage its reputation.

22. As a direct result of Defendants' misconduct, Diablo has been and continues to be substantially harmed.

23. Diablo seeks compensatory and injunctive relief to prevent Defendants' ongoing misconduct.

## PARTIES

24. Plaintiff, Diablo Media, LLC, is a Colorado limited liability company with its principal place of business located in Denver, Colorado.

25. On information and belief, Defendant H2H Interactive, Inc. is a Colorado corporation with its principal place of business located in Denver, Colorado.

26. On information and belief, Defendant Richard Mirsky is an individual residing in Denver, Colorado.

27. On information and belief, Defendant Nikki Zimmer is an individual residing in Denver, Colorado.

28. On information and belief, at all times all Defendants were the principals, agents, affiliates, partners, and/or co-conspirators of each other, and each acted within the course, scope, and authority of such relationships so that, as a result, all Defendants are jointly and severally liable for the acts alleged herein.

## JURISDICTION AND VENUE

29. This Court has subject matter jurisdiction over the federal false advertising and trade libel claims pursuant to the Lanham Act, 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and

1338.  The Court has supplemental jurisdiction over the claims arising under state law pursuant to 28 U.S.C. § 1367(a), in that the state law claims are so related to the claims over which the Court has original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

30.   This Court has personal jurisdiction over Mirsky because, on information and belief, he resides within Colorado, has substantial connections to Colorado, committed the misconduct at issue in Colorado, and directed the misconduct towards a Colorado entity.   In addition, Mirsky has submitted to the jurisdiction of this Court by way of his execution of the Employee Proprietary Information and Inventions Agreement with Diablo.

31.   This Court has personal jurisdiction over Zimmer because, on information and belief, she resides within Colorado, has substantial connections to Colorado, committed the misconduct at issue in Colorado, and directed the misconduct towards a Colorado entity.   In addition, Zimmer has submitted to the jurisdiction of this Court by way of her execution of the Employee Proprietary Information and Inventions Agreement with Diablo.

32.   This Court has personal jurisdiction over H2H because, on information and belief, it is a Colorado-based corporation, conducts substantial business in Colorado, committed the misconduct at issue in Colorado, and directed the misconduct towards a Colorado entity.

33.   Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b)(2) and (c) because a substantial part of the events or omissions giving rise to Diablo's claims occurred within this District, and because Defendants, and each of them, are subject to personal jurisdiction in this District.

//

//

**FACTUAL ALLEGATIONS**

**Affiliate Networks Generally**

34.     Affiliate marketing is a marketing practice in which an online retailer compensates one or more online publishers for each visitor or customer generated for the retailer as a result of the affiliate's marketing efforts.

35.     Although it may seem counterintuitive, within the Internet marketing industry, the retailer—that is, the one in need of advertising services—is called the "Advertiser."

36.     The persons who place the advertisements on their websites and blogs are called, interchangeably, "publishers" or "affiliates."  For ease of reference, they are simply referred to as "Affiliates" throughout this Complaint.

37.     Affiliates range from sophisticated multi-million dollar companies to emerging entrepreneurs just starting out in the business.  Their marketing techniques include everything from rudimentary blogs and online lists to content-rich animated ads.

38.     Like a professional athlete, the overall performance of an Affiliate is judged by a combination of several statistics, with the most important being the Affiliate's so-called "conversion rate"—that is, the percentage of visitors to the Affiliate's site who take the action desired by the Advertiser.  Such an action can include something simple, such as joining the Advertiser's email list or purchasing a product from the Advertiser.  An impressive conversion rate is so important that many Affiliates invest substantial time and money in an effort to improve it.

39.     Other performance metrics speak to an Affiliate's overall abilities and worth, such as "click-through data" (i.e., the percentage of visitors to the Affiliate's site who "click-through"

to the Advertiser's site, regardless of whether an action is taken), and "campaign ROI data" (i.e., the return on the Advertiser's investment generated by the Affiliate).

40.     Conversely, performance statistics are relevant to a particular advertising campaign's ability to attract top Affiliates as well.  For example, a high overall conversion rate for a specific campaign suggests it is easier to run than one with a low conversion rate.

41.     Conversion rates, click-through data, and campaign ROI data are referred to collectively herein as "performance data." An essential—and confidential—element of performance data is the association of specific Affiliates with specific campaigns.

42.     From the Advertiser's perspective, there are literally too many Affiliates to count. An Advertiser must be selective in picking Affiliates with which the Advertiser wishes to invest its advertising dollars.  Moreover, many of the most respected and sought-after Affiliates are not known to the general public, and are not listed online or in trade directories.  These Affiliates typically connect with Advertisers by word of mouth or at trade shows.  Thus, a savvy Advertiser must invest significant time and resources identifying the most effective, efficient, and reliable Affiliates in order to meet the Advertiser's marketing needs.

43.     Most Advertisers simply do not have the time or money needed to root out the Affiliates best suited to their particular campaigns.  Meeting, contracting with, tracking the performance of, and paying potentially hundreds of Affiliates also presents a logistical nightmare for Advertisers, whose primary focus is on other parts of their business.

44.     Similarly, most Affiliates are individuals or small businesses that do not have the means or negotiating power to attract big Advertisers, much less manage them.

45.     The managerial problems presented on both sides of the Advertiser-Affiliate relationship have been solved with the advent of Affiliate networks.  Under this model, the

network enlists hundreds of affiliates, if not more, as its independent contractors.   The Advertisers serve as the network's clients.   The network enters into written agreements with each Advertiser, which provide for auditing and accounting rights, payment schedule, indemnification, and other items that protect both the network and its Affiliates.   Conversely, as a condition of their participation, the Affiliates agree to the network's affiliate terms, which govern their conduct in a manner that protects both the network and its Advertisers.   The network disperses the Advertiser's campaign materials to its affiliates, who generate leads, sales, and other actions for the Advertiser.   The network records each Affiliate's performance by virtue of a tracking pixel or other technology that "fires" when the desired action is completed by a consumer.   The network bills and collects payment from the Advertisers and, after deducting its own portion of the fee, distributes the remainder to the responsible Affiliates.

46.     When a network is involved, the identity of the Affiliates remains unknown to the Advertisers and the identity and marketing contacts at each Advertiser are unknown to the Affiliate.   Generally, as part of their respective agreements with the network, both Advertiser and Affiliate agree not to solicit one another in circumvention of the network.

### Diablo's Business and Trade Secrets

47.     Diablo is a growing affiliate network based in Denver, Colorado.

48.     Because of the highly competitive nature of the Affiliate marketing space, Diablo has recognized the importance of investing time and resources in identifying the most effective Affiliates.   Thus, over the last several years, Diablo has invested considerable time and resources in identifying the most effective, reliable, and efficient Affiliates.

49.     Diablo's Affiliate list, including the contact information and performance data associated with each Affiliate, is of significant value to Diablo.   If Diablo's competitors were to

obtain this information, they could recruit Diablo's most successful Affiliates and significantly lower Diablo's overall conversion rate, thus making Diablo less attractive to potential Advertisers.

50.    Of course, maintaining a stable of proven Affiliates is only one part of Diablo's business model.  Another is having reliable Advertisers whose goods and services are highly attractive to consumers, thus improving conversion rates.  Accordingly, over the last several years, Diablo has invested considerable time and resources in attracting, signing, and maintaining a good business relationship with a roster of Advertisers whose campaigns have proven successful.

51.    Diablo's Advertiser list, including the identity of and contact information for each Advertiser, and the performance data for each related campaign, is of significant value to Diablo. If Diablo's competitors were to obtain this information, they could solicit the Advertisers whose campaigns have been most profitable for Diablo, thus affecting Diablo's revenue.

52.    Finding the right payment model is one of the keys to Diablo's maintenance of its best Affiliates and Advertisers.  Diablo compensates its Affiliates on a cost-per-action, or CPA basis.  In addition to describing the payment method, "CPA" is used within the industry, and this Complaint, to describe the payment amount.

53.    On the one hand, the CPA needs to be low enough to attract the Advertiser and maximize the Advertiser's return on the campaign.  On the other hand, the CPA needs to be high enough to attract the best Affiliates and cover Diablo's fees as well.  Thus, over the last several years, Diablo has invested considerable time and resources in developing a business method to determine the best CPA for each campaign.

//

54.     Information regarding Diablo's CPAs, including the methods by which they are derived, the CPAs associated with each campaign and each Affiliate, and so forth, are of significant value to Diablo.   Indeed, if one of Diablo's competitors sought to recruit an Advertiser or an Affiliate away from Diablo, the best means of doing so would be to offer a slightly more attractive CPA than Diablo.

55.     Because Diablo has invested so much time and resources in recruiting the best Affiliates, signing the best Advertisers, collecting performance data, and determining the appropriate CPAs, it keeps all information related to these three things confidential.

56.     For example, Diablo keeps the identity of and contact information for its Affiliates, and the performance data collected for each, strictly confidential and does not reveal the same publicly or to its Advertisers.

57.     Moreover, when Advertisers sign an "Advertising Agreement" with Diablo, they expressly agree that, during the term of that agreement, and for six months thereafter, they will not knowingly solicit any of Diablo's Affiliates.

58.     Diablo also keeps its list of Advertisers and the contact information and performance data associated therewith confidential.   Diablo's contacts at each Advertiser are never disclosed publicly or to its Affiliates.

59.     Moreover, when Affiliates apply to be part of the Diablo network, they must agree to Diablo's "Affiliate Agreement," which includes the following provision, wherein Diablo is the referenced "Company":

### 13. Non-Solicitation with Advertisers

Affiliate will not participate in any performance based advertising relationship with any advertiser whose ads are posted on the Company Site, unless a previously existing business relationship between advertiser and Affiliate can be demonstrated to the reasonable satisfaction of Company….

60.     Both the Affiliate Agreement and the Advertising Agreement contain nondisclosure provisions that bar disclosure of any of Diablo's confidential information that either Affiliate or Advertiser is exposed to during the course of its relationship with Diablo.

61.     In order to maintain the confidentiality of its Affiliate, Advertiser, and CPA information within its own ranks, Diablo requires its employees to sign an Employee Proprietary Information and Inventions Agreement (the "Proprietary Agreement"), which identifies such information as "proprietary" or confidential, and prevents its disclosure outside Diablo.

62.     In addition to the nondisclosure aspect of the Proprietary Agreement, this contract also prevents Diablo personnel from using Diablo's proprietary information, such as Advertiser and Affiliate contact information, to compete with Diablo either before or after leaving its employ.  Section 4 of the Proprietary Agreement reads:

> **4. ADDITIONAL ACTIVITIES.**  I agree that during the period of my employment by the Company I will not, without the Company's express written consent, engage in any employment or business activity which is competitive with, or would otherwise conflict with, my employment by the Company.  I agree further that for the period of my employment by the Company and for one (1) year after the date of termination of my employment by the Company I will not, either directly or through others, (a) solicit or attempt to solicit any employee, independent contractor or consultant of the Company to terminate his or her relationship with the Company in order to become an employee, consultant or independent contractor to or for any other person or entity, (b) influence or attempt to influence any client of the Company to divert its business from the Company to any other person or company engaged in a similar business or to cease doing business with the Company, (c) make any statement or perform any act intended to cause existing or potential clients of the Company to make use of the services of any business competitive with the Company, or (d) hire or attempt to hire any person who was employed by the Company within the last six (6) months.

63.     In addition to requiring its employees to sign confidentiality agreements, Diablo keeps the identities of, contact information of, and CPAs associated with each Affiliate and each Advertiser on password-protected computers located on secure physical premises.  Specifically, Diablo retains this confidential data in a secure database, which not only limits access by

employees, but records the access of each specific employee to ensure that Diablo's confidential information has only been used for proper purposes.

64.      Diablo considers the identity of its Affiliates, the contact information associated with each Affiliate and Advertiser, the performance data associated with each Affiliate and each campaign, and all CPA information to be trade secrets.

### Mirsky's Employment with Diablo

65.      On or around April 25, 2010, Diablo hired Mirsky as its Vice President of Business Development.

66.      Mirsky never worked for Diablo in any other position than that of Vice President of Business Development.

67.      At Diablo, a "Vice President" position is considered an executive position.  At all times during Mirsky's employment with Diablo, Diablo only had one or two personnel with the title of "Vice President," including Mirsky.  Accordingly, Mirsky, like all such executives, bore substantial decision-making and managerial responsibilities at Diablo.

68.      On April 26, 2010, Mirsky entered into a Proprietary Agreement with Diablo, a true and correct copy of which is attached hereto as **Exhibit A**.

69.      As Vice President of Business Development, Mirsky oversaw Diablo's relationships with both Affiliates and Advertisers.  Mirsky was personally responsible for developing and managing the relationships with Diablo's top-tier Affiliates and Advertisers.  As such, Mirsky was in personal contact with Diablo's best-performing Affiliates and Advertisers by virtue of his position at Diablo.  Mirsky also had access to Diablo's trade secrets concerning its Affiliates, its Advertisers, and its CPAs.

//

70.     As part of his employment with Diablo, Mirsky received a base salary and a monthly commission based on Diablo's net profits.

## Zimmer's Employment with Diablo

71.     On or about August 12, 2011, Diablo hired Zimmer as an Affiliate Manager.

72.     As part of the terms of her employment agreement with Diablo, as an Affiliate Manager, Zimmer was responsible for:

> managing all aspects of [Diablo's] internal and external affiliate programs and delivering affiliate marketing buys to support customer acquisition and transaction goals at allowable acquisition costs.  The Affiliate [] Manager will continuously identify, evaluate and recruit new affiliates in order to increase distribution; as well as interface with internal marketing and product and technical groups to develop, implement and support affiliate marketing strategies and programs.  This individual will steward, coordinate and oversee campaigns through all phases of launch and maintenance, including negotiation of affiliate partnerships and deals, contract review and approval, creative development, trafficking, reporting and analysis and optimization.

73.     On September 6, 2011, Zimmer entered into a Proprietary Agreement with Diablo, a true and correct copy of which is attached hereto as **Exhibit B.**

74.     As an Affiliate Manager, Zimmer was responsible for recruiting new Affiliates and working with them to implement campaigns and improve their conversion rates.  Zimmer received a base salary and a monthly commission based on the net profits earned by Diablo that were attributable to the Affiliates managed by Zimmer.

75.     From on or about October 1, 2011 through the remainder of her employment with Diablo, Zimmer reported directly to Mirsky.

76.     On information and belief, at some point during her employment with Diablo, Zimmer became romantically involved with Mirsky.

//

**Mirsky's and Zimmer's Departure from Diablo**

77.     In or about mid-January, 2012, Diablo discovered evidence that several of the Affiliates managed by Zimmer were engaged in conduct prohibited by Diablo, such as generating leads or other actions through advertising and practices that were barred by either the Advertiser or Diablo.

78.     On information and belief, both Zimmer and Mirsky were aware of and had approved of the Affiliates' misconduct.  Although the exact reasons for Zimmer's and Mirsky's approval is presently unknown to Diablo, it is possible that they were motivated by the objective of improving Zimmer's numbers and/or commissions.

79.     Around this same time, several Diablo employees complained that Mirsky showed favoritism to Zimmer.  For example, on information and belief, Mirsky denied other Affiliate Managers approval, when requested, to run certain advertising campaigns, but later approved Zimmer to run those same campaigns.

80.     In or around January 11, 2012, Diablo management met with both Zimmer and Mirsky to discuss their participation in the Affiliate misconduct.

81.     On information and belief, during the ensuing week, while Diablo's management considered the appropriate response to Zimmer's and Mirsky's participation in the Affiliate misconduct, Mirsky indicated to other Diablo employees that he planned to leave Diablo, start a competing affiliate network, and take Diablo's accounts with key Advertisers.

82.     On information and belief, either during this week, or in the weeks and months before in anticipation of the discovery of the Affiliate misconduct, Mirsky, with the assistance of Zimmer, prepared a list or record of Diablo's key Advertisers or Affiliates, which record included Diablo's trade secrets.

83.     On January 17, 2012, Diablo terminated Zimmer and Mirsky.

84.     Both Zimmer and Mirsky refused to accept any severance package or sign any separation agreement with Diablo.

85.     Based on Mirsky's comments to Diablo employees before his departure, on January 19, 2012, Diablo's attorneys served a letter on Mirsky demanding that he (1) cease and desist any misappropriation of Diablo's trade secrets, and (2) preserve all relevant documents and correspondence.

86.     In response to Diablo's demand, Mirsky expressly represented to Diablo—both personally and through counsel—that he would not directly compete with Diablo but planned to continue to work in Internet advertising by generating leads and sending commercial email.

### Defendants' Misconduct

87.     On information and belief, on January 16, 2012—a holiday and one day prior to his termination by Diablo—Mirsky registered the domain name <h2hinteractive.com>.

88.     On information and belief, on or about January 21, 2012, Mirsky incorporated H2H.

89.     On information and belief, H2H does not have a formal office but is instead run out of Mirsky's home using Mirsky's personal resources.

90.     On information and belief, Zimmer is an employee, agent, or representative of H2H.

91.     On information and belief, while still employed at Diablo, Mirsky and Zimmer avoided setting up new Advertiser accounts or campaigns that came their way with the intent of setting up those accounts and campaigns through H2H after leaving Diablo.

//

92.     On information and belief, immediately after Mirsky's and Zimmer's departure from Diablo, and perhaps well before, Defendants began contacting Diablo's top Advertisers and offering to run their campaigns through H2H in direct competition with Diablo.

93.     Diablo first learned that Mirsky and had followed through on his threats to form a competing company and steal Diablo's Advertisers on or about February 2, 2012, when one of Diablo's largest Advertisers inadvertently responded to Mirsky's offers to run the same campaign as Diablo by emailing him at his former Diablo e-mail address.

94.     When Diablo confronted Mirsky about his solicitation of Diablo's Advertiser, Mirsky admitted to working the Advertiser on the campaign, but again expressly represented and contended that Defendants were not directly competing with Diablo and that Diablo had misunderstood the e-mail.

95.     In early April 2012, Diablo management attended an affiliate marketing conference wherein they heard rumors that (1) Defendants had purposefully solicited Diablo's Advertisers in an effort to steal business from Diablo, (2) Defendants had attempted to frustrate Diablo's business efforts by introducing top Affiliates to top Advertisers and encouraging them to do business directly rather than through Diablo, and (3) Defendants had advertised or promoted H2H as a "companion" or "side" business related to Diablo in an effort to secure the same campaigns as Diablo at the same CPAs.

96.     One of these rumors was proven true when Chilay, one of Diablo's top Advertisers, admitted to Diablo that it had been solicited by Defendants to run the same campaigns as Diablo in direct competition with Diablo.  In a complaint recently filed by Chilay against Defendants in San Diego Superior Court, *Chilay v. Mirsky et al.*, Chilay alleged:

> Soon after leaving Diablo, Mirsky contacted Chilay and asked to enter into a similar arrangement, through H2H, wherein he would provide leads to Chilay.

Mirsky asked to do so for three campaigns, which were Chilay's three most successful campaigns. . . . Mirsky represented that he would be acting in the same role as Diablo, meaning he would be driving potential leads to Chilay's landing pages.

97.     Based on Mirsky's representation "that he would be acting in the same role as Diablo," Chilay provided Mirsky with access to its three most successful campaigns.

98.     According to Chilay, Defendants' solicitation of Chilay was done not only in an attempt to divert business from Diablo, but from Chilay as well.  Chilay is, itself, a marketing company that is highly specialized in that it generates leads for law firms and other businesses seeking qualified individuals to participate in mass tort class action lawsuits.  When Defendants gained access to Chilay's successful campaigns, they also gained access to Chilay's proprietary business methods and marketing strategies.  According to Chilay's complaint:

> In mid-March 2012, through a posting on the Facebook group "super affiliates," Chilay learned that Mirsky had quickly developed his own landing pages and either had contracted directly with attorneys or was attempting to contract directly with attorneys, thereby directly competing with Chilay while at the same time having access to Chilay's confidential, proprietary information….
>
> Mirsky has set up at least three landing pages that are very similar in look, layout and overall content to Chilay's landing pages for substantially identical campaigns.  In addition, Mirsky has set up domain names that are confusingly similar to domain names that Chilay has been using for years, and for which leads are familiar and trust placing their personal information on such sites. . . . Chilay has learned that its clients are ending up on Defendants' web site landing page, thinking that it belongs to Chilay….

99.     In other words, once Defendants had access to Chilay's business methods and marketing strategies for generating leads for attorneys, Defendants used those methods and strategies for their own benefit to create similar campaigns of their own.  Defendants then ran those campaigns in direct competition with Chilay's campaigns—including the campaigns run by Diablo.

//

100.    On April 24, 2012, Chilay filed suit against Defendants, asserting claims for misappropriation of trade secrets, unfair competition, violations of California Business and Professions Code section 17200, breach of confidence, unjust enrichment, and declaration of constructive trust.

101.    Defendants' unorthodox business strategy—that is, to intentionally injure both Diablo and Advertisers in one fell swoop—was not limited to Chilay.  On information and belief, in April 2012, Defendants contacted certain Affiliates of Diablo and invited them to stop running a particular campaign through Diablo and instead run it through a third party with the promise of a higher payout through the third party.  At the time this invitation was made, Defendants knew and understood that the campaign in question was the subject of an "exclusive" agreement between Diablo and the respective Advertiser, wherein the Advertiser had agreed to run all CPA advertising for the campaign through Diablo so long as Diablo met certain quotas.  The third party was authorized to run the Advertiser's campaign using a different payment structure.

102.    As a result of Defendants' actions with respect to these Affiliates, Defendants (1) diverted business from Diablo with the intent of causing Diablo to fail to meet its quota under the exclusive agreement with the Advertiser and (2) caused the Advertiser to pay more for advertising by the exact same Affiliates.

103.    On information and belief, in addition to and in furtherance of their efforts to steal Diablo's Advertisers and Affiliates, Defendants have repeatedly made false and disparaging comments about Diablo and its business.  On more than one occasion, Diablo has been informed that Mirsky has told Advertisers and Affiliates that Diablo is "just a broker" of Internet advertising with "no sustainable business model." Because Mirsky is a former executive of Diablo, his statements carry the weight of insider information.  Through these and other

comments, Defendants have falsely stated and indicated that Diablo is on the brink of shutting down.

104.    Defendants' statements that Diablo could be going out of business are very serious given the unstable economic climate of affiliate marketing.    In recent months, overexpansion, market saturation and other issues have caused several of the largest affiliate networks to go out of business, leaving their affiliates and vendors unpaid and their advertisers without their services.    As a result, the mere intonation that an affiliate network may go out of business can cause both affiliates and advertisers to immediately defect to another network.

105.    Indeed, in a recent article in an Internet marketing trade publication, the author documented the brazen tactic of one affiliate network issuing a press release directly questioning the ability of its largest competitors to pay their affiliates.[1]    The author observed, "This comes at a time where more and more affiliates are worried about the financial ability of networks to pay, and shows a new more aggressive stance of competing networks in advertising their services and ability to pay."

106.    At other times, Defendants have made false statements about their own products and services in comparing them to Diablo.    For example, in the March 21, 2012 Facebook "Super Affiliates" posting referenced in the Chilay complaint, Mirsky posted, on behalf of H2H, that "The difference [between Diablo and H2H] is that h2h owns and operates these legal offers. We are not some network brokering out someone else's campaigns."    On information and belief, Defendants' claim that H2H owned its offers was false as H2H, like Diablo, was generating leads for law firms and other legal entities.

---

[1] Pace Latin, "Adknowledge Bashes Neverblue & Epic Financials," *Performance Marketing Insider*, May 1, 2012, *available at* http://performinsider.com/2012/05/adknowledge-bashes-neverblue-epics-financials/.

107.    On information and belief, the specific examples of misconduct alleged herein are just a few of many instances of unlawful conduct by Defendants directed at Diablo.  Indeed, on information and belief, as of the date of this Complaint, Defendants were running at least eighty-five (85) different campaigns, 72% of which are campaigns Diablo was running during Mirsky's employment at Diablo.

108.    As a result of Defendants' misconduct, Diablo has been substantially harmed, by a decrease in revenue and otherwise, and continues to be harmed.

## FIRST CLAIM FOR RELIEF

### (False Advertising under the Lanham Act, 15 U.S.C. § 1125(a))

### Against all Defendants

109.    Diablo repeats and incorporates by reference all of the allegations set forth above.

110.    By engaging in the above-described activities, Defendants have made, or knowingly conspired and agreed to be made, material false or misleading representations of fact.

111.    For example, in soliciting Chilay, Defendants misrepresented to Chilay that they would run Chilay's three most successful campaigns "acting in the same role as Diablo," when, in fact, Defendants exploited and replicated Chilay's campaigns in order to launch Defendants' own campaigns in direct competition with Chilay and Diablo.

112.    As another example, Defendants misrepresented to Affiliates that Defendants owned and operated their own campaigns while Diablo was just "some network brokering out someone else's campaigns," when, in fact, Diablo and H2H are both affiliate networks acting in the same role with respect to their campaigns.

113.    As another example, Defendants have repeatedly misrepresented to Advertisers and Affiliates that Diablo risks going out of business.

114.    As another example, Defendants have repeatedly misrepresented to Advertisers and Affiliates that H2H is a "complimentary" or "side" business of Diablo, or is otherwise affiliated with Diablo.

115.    Defendants made the representations of fact in connection with the commercial advertising or promotion of Defendants' goods, services, or commercial activities.

116.    Defendants made the representations of fact across state borders and in interstate commerce.

117.    Defendants' actions, as alleged above, violate Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).

118.    At all times relevant, Defendants' conduct has been willful and intentional.

119.    As a direct and proximate result of the actions, conduct, and practices of Defendants alleged above, Diablo has been damaged and will continue to be damaged unless Defendants' conduct is enjoined by this Court.

120.    Diablo is entitled to injunctive relief against Defendants, as well as all other remedies available under the Lanham Act, including, but not limited to, damages in an amount to be proven at trial, statutory penalties, disgorgement of Defendants' profits, and costs and attorneys' fees.

//

//

//

//

//

//

## SECOND CLAIM FOR RELIEF

### (Trade Libel under the Lanham Act, 15 U.S.C. § 1125(a))

### Against all Defendants

121.    Diablo repeats and incorporates by reference all of the allegations set forth above.

122.    By engaging in the above-described activities, Defendants have made, or knowingly conspired and agreed to be made, material false or misleading representations of fact of and concerning Diablo to Advertisers and Affiliates.

123.    The representations of fact included, but were not limited to, misrepresentations about the business, goodwill, and reputation of Diablo.

124.    For example, Defendants have repeatedly misrepresented to Diablo's Advertisers and Affiliates, and others in the affiliate marketing industry, that Diablo risks going out of business.

125.    Defendants made the representations of fact in connection with the commercial advertising or promotion of Defendants' goods, services, or commercial activities.

126.    Defendants made the representations of fact across state borders and in interstate commerce.

127.    Defendants' actions, as alleged above, violate Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).

128.    At all times relevant, Defendants' conduct has been willful and intentional.

129.    As a direct and proximate result of the actions, conduct, and practices of Defendants alleged above, Diablo has been damaged and will continue to be damaged unless Defendants' conduct is enjoined by this Court.

//

130.    Diablo is entitled to injunctive relief against Defendants, as well as all other remedies available under the Lanham Act, including, but not limited to, damages in an amount to be proven at trial, statutory penalties, disgorgement of Defendants' profits, and costs and attorneys' fees.

## THIRD CLAIM FOR RELIEF

### (Common Law Trade Libel)

### Against All Defendants

131.    Diablo repeats and incorporates by reference all of the allegations set forth above.

132.    By engaging in the above-described activities, Defendants have made, or knowingly conspired and agreed to be made, material false or misleading statements of fact of and concerning Diablo to Advertisers and Affiliates.

133.    Defendants' false statements of fact were the intentional publication of injurious falsehoods disparaging the quality of Diablo's business, services, and financial well-being.

134.    As a direct and proximate result of Defendants' false statements of fact, Diablo has suffered a pecuniary loss in an amount to be proven at trial.

## FOURTH CLAIM FOR RELIEF

### (Misappropriation of Trade Secrets under C.R.S. §§ 7-74-101 et seq.)

### Against All Defendants

135.    Diablo repeats and incorporates by reference all of the allegations set forth above.

136.    Diablo's trade secrets include the names, addresses, telephone numbers, payment structure, click through data, conversion data, campaign ROI data, and other confidential business and financial information associated with each of the Affiliates.

//

137.    Diablo's trade secrets also include the names, addresses, telephone numbers, payment structure, campaign ROI data, and other confidential business and financial information associated with each of the Advertisers and their respective campaigns.

138.    Diablo's trade secrets also include information concerning which Affiliates are working on which Advertiser's campaigns, and which of those Affiliates are top-performers on each campaign.

139.    At all times, Diablo has derived substantial economic value from its trade secrets. Indeed, Diablo's trade secrets are the driving force of its business.

140.    At all times, Diablo has taken measures to prevent its trade secrets from becoming available to persons other than those selected by Diablo to have access thereto for limited purposes.

141.    Mirsky and Zimmer obtained knowledge of the trade secrets under circumstances giving rise to a duty to maintain their secrecy and limit their use.

142.    Defendants, and each of them, knew or had reason to know that Mirsky's and Zimmer's  knowledge of the trade secrets was acquired under circumstances giving rise to a duty to maintain their secrecy and limit their use.

143.    Mirsky and Zimmer disclosed the trade secrets of Diablo without Diablo's express or implied consent.

144.    Defendants, and each of them, used Diablo's trade secrets without Diablo's express or implied consent.

145.    Defendants actions, as alleged herein, constitute misappropriation of Diablo's trade secrets in violation of the Colorado Uniform Trade Secrets Act, C.R.S. §§ 7-74-101 et seq.

146.    As a result of Defendants' misconduct, Diablo has been substantially harmed.

147.     Diablo is entitled to injunctive relief against Defendants, as well as all other remedies available under the Colorado Uniform Trade Secrets Act.

148.     Defendants' misappropriation of Diablo's trade secrets was done maliciously, willfully, and with wanton disregard of Diablo's rights and feelings, thereby warranting an award of exemplary damages and attorneys' fees under C.R.S. §§ 7-74-104(2) and 7-74-105.

## FIFTH CLAIM FOR RELIEF

### (Intentional Inducement of Breach of Contract)

### Against All Defendants

149.     Diablo repeats and incorporates by reference all of the allegations set forth above.

150.     Diablo has entered into a separate agreement with each of its Advertisers (the "Advertiser Agreements"), each of which is a valid, binding contract supported by adequate consideration. Some of the Advertiser Agreements are "exclusive" agreements wherein the Advertiser has agreed to run certain campaigns only through Diablo.

151.     Diablo has entered into an agreement with each of its Affiliates (the "Affiliate Agreements"), each of which is a valid, binding contract supported by adequate consideration.

152.     Defendants knew about the Advertiser Agreements, the Affiliate Agreements, and each of them.

153.     On information and belief, Defendants have contacted some Affiliates and invited them to run the same advertising campaigns as they did for Diablo for Defendants and/or third parties, with the intent and understanding that doing so would cause the Affiliates to breach the Affiliate Agreements.

154.     On information and belief, Defendants undertook the actions alleged in the preceding paragraph with the additional intent and understanding that, by having the Affiliates

run the same advertising campaigns as Diablo for third parties, without the knowledge of Diablo or the Advertiser, the Affiliates' competing campaigns would affect Diablo's campaign performance and would likely cause Diablo to breach its Agreement with the Advertiser.

155.    As a result of Defendants' actions, some Affiliates have breached the Affiliate Agreements.

156.    On information and belief, Defendants have contacted some Advertisers and invited them to run through Defendants the same advertising campaigns as they run through Diablo with the intent and understanding that doing so would cause the Advertisers to breach the exclusivity provisions in the Advertiser Agreements.

157.    As a result of Defendants' actions, some Advertisers have breached the Advertiser Agreements.

158.    As a direct and proximate result of Defendants' inducement of the breach of the Affiliate Agreements and the Advertiser Agreements, as described herein, Diablo has been substantially harmed in an amount to be proven at trial.

## SIXTH CLAIM FOR RELIEF

### (Breach of Contract)

### Against Mirsky

159.    Diablo repeats and reincorporates by reference all of the allegations above.

160.    On April 26, 2010, Diablo and Mirsky entered into the Proprietary Agreement.

161.    The Proprietary Agreement is a valid, binding contract supported by adequate consideration.

//

//

162.    Among other things, the Proprietary Agreement required Mirsky to keep Diablo's proprietary information confidential and not to disclose the information to any person without Diablo's express consent.

163.    In the Proprietary Agreement, Mirsky also agreed not to engage in any employment or business activity which is competitive with Diablo.

164.    In the Proprietary Agreement, Mirsky also agreed not to solicit any of Diablo's independent contractors to work for any other person or entity.

165.    In the Proprietary Agreement, Mirsky also agreed not to make any statement or perform any act intended to cause existing or potential clients of Diablo to make use of the services of any business competitive with Diablo.

166.    In the Proprietary Agreement, Mirsky also agreed not to hire or attempt to hire any person who was employed by Diablo within the previous six (6) months.

167.    Mirsky breached the Proprietary Agreement by disclosing and using Diablo's proprietary information in the course of his operation of H2H without Diablo's consent.

168.    Mirsky breached the Proprietary Agreement by engaging in business activity in direct competition with Diablo.

169.    Mirsky breached the Proprietary Agreement by soliciting Diablo's independent contractors, or Affiliates, to work for H2H and other entities.

170.    Mirsky breached the Proprietary Agreement by making statements and taking actions with the express intent of causing existing and potential clients of Diablo to use the competitive services of H2H and other entities.

171.    Mirsky breached the Proprietary Agreement by hiring Nikki Zimmer, a former Diablo employee, to work for H2H.

172.    Diablo has fulfilled all of its obligations under the Proprietary Agreement.

173.    Mirsky's actions constitute material breaches of the Proprietary Agreement.

174.    As a direct and proximate result of Mirsky's breach of the Proprietary Agreement, Diablo has been damaged and continues to be damaged in an amount to be proven at trial.

175.    In accordance with Section 10.1 of the Proprietary Agreement, Diablo is also entitled to recovery of its attorneys' fees.

## SEVENTH CLAIM FOR RELIEF

### (Breach of Contract)

### Against Zimmer

176.    Diablo repeats and reincorporates by reference all of the allegations above.

177.    On September 6, 2011, Diablo and Zimmer entered into the Proprietary Agreement.

178.    The Proprietary Agreement is a valid, binding contract supported by adequate consideration.

179.    Among other things, the Proprietary Agreement required Zimmer to keep Diablo's proprietary information confidential and not to disclose the information to any person without Diablo's express consent.

180.    Zimmer breached the Proprietary Agreement by, among other things, disclosing and using Diablo's proprietary information in the course of employment and/or representation of H2H without Diablo's consent.

181.    Diablo has fulfilled all of its obligations under the Proprietary Agreement.

182.    Zimmer's actions constitute material breaches of the Proprietary Agreement.

//

183.    As a direct and proximate result of Zimmer's breach of the Proprietary Agreement, Diablo has been damaged and continues to be damaged in an amount to be proven at trial.

184.    In accordance with Section 10.1 of the Proprietary Agreement, Diablo is also entitled to recovery of its attorneys' fees.

### PRAYER FOR RELIEF

**WHEREFORE**, Diablo Media respectfully requests judgment as follows:

1. That the Court enter a judgment against Defendants, and each of them, that they are:

   a. Liable to Diablo for false advertising under 15 U.S.C. § 1125(a);

   b. Liable to Diablo for trade libel under 15 U.S.C. § 1125(a);

   c. Liable to Diablo for common law trade libel;

   d. Liable to Diablo for misappropriation of Diablo's trade secrets in violation of C.R.S. §§ 7-74-101 et seq.; and

   e. Liable to Diablo for intentional inducement of breach of contract.

2. That the Court enter a judgment against Mirsky and Zimmer, and each of them, that they are liable to Diablo for breach of contract.

3. That the Court enter a judgment against Defendants, and each of them, and in favor of Diablo as follows:

   a. Compensatory damages for false advertising and trade libel under the common law of Colorado and 15 U.S.C. § 1117(a);

   b. Damages, including compensatory damages and unjust enrichment, under C.R.S. § 7-74-104(1);

//

    c.   Compensatory damages for intentional inducement of breach of contract under the common law of Colorado;

    d.   Treble damages for oppression, fraud and malice in false advertising and trade libel under 15 U.S.C. § 1117 (a);

    e.   Exemplary damages for fraud, malice, or a willful and wonton disregard of Diablo's rights and feelings in the misappropriation of trade secrets under C.R.S. § 7-74-104 (2);

    f.   Attorneys' fees and necessary expenses under 15 U.S.C. § 1117(a) and § 7-74-105;

    g.   All costs of this action; and

    h.   Pre-judgment interest.

4.   That the Court enter a judgment against Mirsky and Zimmer, and each of them, and in favor of Diablo as follows:

    a.   Compensatory damages for breach of contract;

    b.   Attorneys' fees and necessary expenses under Section 10.1 of the Proprietary Agreement;

    c.   All costs of this action; and

    d.   Pre-judgment interest.

//

//

//

//

//

5.  That the Court grant to Diablo such additional relief as is just and proper.

Respectfully Submitted,

DATED: May 4, 2012                                    KRONENBERGER ROSENFELD, LLP

By: _____

Karl S. Kronenberger
150 Post Street, Suite 520
San Francisco, CA 94108
Karl@KRInternetLaw.com
Telephone: (415) 955-1155
Facsimile: (415) 955-1158

Attorneys for Plaintiff

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial of this action by jury.

DATED: May 9, 2012                KRONENBERGER ROSENFELD, LLP


By: _____

                Karl S. Kronenberger
                150 Post Street, Suite 520
                San Francisco, CA 94108
                Karl@KRInternetLaw.com
                Telephone: (415) 955-1155
                Facsimile: (415) 955-1158

                Attorneys for Plaintiff